UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| BLYTHE TAPLIN, | : | | |
| *on Behalf of Rogers Lacaze*, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1815 (RC) |
| | : | | |
| v. | : | Re Document No.: | 17 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

# MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on the defendants' motion for summary judgment. The plaintiff, an attorney representing a Louisiana death row inmate convicted of first-degree murder, filed a Freedom of Information Act request seeking federal law enforcement records relating to the third party whom the plaintiff asserts actually perpetrated the crime for which her client was convicted. The defendants seek summary judgment under Exemption 7(C) on the basis that the public interest in production of the requested documents—or even an acknowledgement that such documents exist—is outweighed by the third party's privacy interest. Because the plaintiff has not met her evidentiary burden of showing that a reasonable person would believe that the government is withholding information that could corroborate her theory that the third party committed the crime, the Court will grant the defendants' motion.

## II. FACTUAL BACKGROUND

In 1995, Rogers Lacaze was convicted of three counts of first-degree murder and sentenced to death in connection with the brutal shootings that occurred at the Kim Anh Vietnamese Restaurant in New Orleans East. *See generally State v. Lacaze*, 824 So. 2d 1063 (La. 2002). During the early morning hours of March 4, 1995, New Orleans Police Officer Antoinette Frank, who often worked an off-duty security detail at the family-owned Kim Anh, entered the restaurant with a man she had earlier introduced as her nephew. The assailants shot and killed 25-year-old New Orleans Police Officer Ronald Williams, who was on detail at the restaurant that night, along with siblings 24-year-old Ha Vu and 17-year-old Cuong Vu, employees and members of the family that owned the restaurant. *See id.* at 1066, 1069. Officer Williams's wallet was also taken after he was killed. *See id.* at 1069. Quoc Vu and Chau Vu, siblings of Ha and Cuong, sought refuge in a room-sized cooler and survived the attack. *See id.* at 1067. According to the prosecution's theory of the case, Ms. Frank "was becoming increasingly angry over being cut out of what she considered an equitable share of the paid details at the Kim Anh Restaurant." *Id.* at 1070. The murder weapon was not found before trial, and the New Orleans Police Firearms Examiner was unable to conclude that all casings, bullets, and fragments recovered from the crime scene were fired from the same weapon. *See id.* at 1069 & n.6.

Mr. Lacaze and Ms. Frank were both charged with the Kim Anh murders, but the cases were severed. *See id.* at 1066. Quoc Vu had positively identified Mr. Lacaze as Ms. Frank's accomplice in a photo line-up the morning after the murders and identified him again at trial. *See id.* at 1068. Chau Vu also identified Mr. Lacaze as the accomplice at trial, but had been unable to make an identification from the photo line-up. *See id.* The prosecution also connected

Mr. Lacaze to the Kim Anh murders by presenting evidence that (1) phone records showed a series of calls from Mr. Lacaze to Ms. Frank around the time of the murders; (2) on March 3, a uniformed Ms. Frank and a young African-American male with gold teeth[1] were seen in a Wal-Mart store inquiring about 9 mm cartridges; and (3) the night manager of a Chevron gas station near the home of Mr. Lacaze's brother told police that Mr. Lacaze used Officer Williams's credit card to purchase gasoline at around 2:30 a.m. one morning in early March. *See id.* at 1069–70 & n.7. In his initial statements to police the morning after the murders, Mr. Lacaze admitted that he was in the restaurant at the time of the shootings but insisted that he did not kill anyone or fire any weapon. *See id.* at 1068. He told detectives that "Frank told him not to worry, that she would return and take care of things[.] She would go to the [station] and report that several black masked men broke through the back door and started shooting." *Id.* at 1068 n.5.

At trial, Mr. Lacaze repudiated his statements to police and insisted that those statements were products of police threats and coercion. *See id.* at 1070. He testified that, instead, he initially went to Kim Anh with Ms. Frank to eat, but Ms. Frank dropped him off at his girlfriend's apartment at around 12:20 a.m., before the shootings occurred. *See id.* He also testified that his brother picked him up at 12:30 a.m. to shoot pool at Mr. C's Pool Hall, where they played until about 2:00 a.m. and then returned to his brother's apartment. *See id.* Mr. Lacaze's brother, Michael Lacaze, supported this alibi at trial, but "the manager of Mr. C's Pool Hall testified unequivocally that Michael played pool late that Friday night without his brother." *Id.* at 1070–71. The defense posited that Adam Frank, Antoinette's brother, was the true accomplice, but the evidence in support of this theory presented at trial, if any, is unclear from the record. *See id.* at 1071.

---

[1] At trial, Mr. Lacaze "was asked to stand and display his (gold) teeth for jurors." *State v. Lacaze*, 824 So. 2d 1063, 1066 n.4 (La. 2002).

After 79 minutes of deliberation, the jury unanimously found Mr. Lacaze guilty of all three counts of first-degree murder. *See id.* at 1072. In a separate sentencing phase in which both sides presented evidence relating to aggravating and mitigating factors, the jury recommended—and the court adopted—a sentence of death. *See id.* In a separate trial after Mr. Lacaze's conviction, Antoinette Frank was also convicted of first-degree murder and sentenced to death. *See generally State v. Frank*, 803 So. 2d 1 (La. 2001).

After 18 years on death row, Mr. Lacaze maintains that he is innocent. According to the attorneys now representing Mr. Lacaze in post-conviction proceedings, evidence that has come to light after trial supports the defense's argument that Antoinette's brother, Adam, was the actual accomplice. *See* Compl. ¶¶ 18–30, ECF No. 1. The attorneys assert that (1) reports from Mr. Frank's arrest related to a separate crime reveal that witnesses had heard him bragging about killing a New Orleans Police officer; (2) Mr. Frank was later found in possession of a 9 mm Beretta, model 92G—the same caliber, make, and model as the weapon believed to have been used to commit the Kim Anh murders;[2] and (3) sometime before the murders occurred, Officer Williams ejected Adam Frank from the Kim Anh restaurant, prompting Antoinette to threaten Officer Williams's life. *See id.* ¶¶ 25, 27–28; Hardy Decl. Ex. A n.1, ECF No. 17-3.

The plaintiff, Blythe Taplin, is an attorney for the Capital Appeals Project—an organization that provides representation to indigent individuals on Louisiana's death row, including Mr. Lacaze. On February 24, 2012, Ms. Taplin submitted a request to the Federal Bureau of Investigation ("FBI") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012), seeking the production of documents relating to any investigation the agency had

---

[2] The gun allegedly found on Mr. Frank contained a partial serial number, whose identifiable digits matched exactly with the number of the gun believed to have been used in the Kim Anh murders. *See* Compl. ¶ 28, ECF No. 1.

4

done regarding Adam Frank, Jr.  *See generally* Hardy Decl. Ex. A, ECF No. 17-3.  Ms. Taplin asserts that the FBI has responsive documents based on (1) an Ouachita Parish Sheriff's Department notice specifying that Mr. Frank was "wanted by . . . the FBI in New Orleans"; and (2) an entry in an Orleans Parish District Attorney's Office privilege log described as "Adam Frank, Jr.'s FBI rap sheet."  *See* Compl. ¶¶ 26, 28, ECF No. 1.  On March 14, 2012, the agency issued a *Glomar* response,[3] invoking FOIA Exemptions 6 and 7(C) and refusing to either confirm or deny that it has any documents concerning Mr. Frank.  *See* Hardy Decl. Ex. B, ECF No. 17-3.  Ms. Taplin promptly appealed the FBI's response to the Department of Justice's Office of Information Policy ("OIP"), and the OIP affirmed the agency's *Glomar* response.  *See id.* Exs. C, E.

On November 8, 2012, Ms. Taplin filed a complaint in this Court against both the FBI and the Department of Justice ("DOJ") (collectively, "Defendants" or the "Government").[4]  In her prayer for relief, Ms. Taplin seeks an order directing the Government to process and produce the requested documents in an expedited manner or, in the alternative, to produce an index of the requested documents and submit them to the Court for *in camera* review.  *See* Compl. ¶¶ 10–11, ECF No. 1.  Defendants have moved for summary judgment on the FBI's *Glomar* response.  *See*

---

[3] In a *Glomar* response, the agency refuses to either confirm or deny the existence of responsive documents on the basis that doing so would compromise security or privacy.  *See generally Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).  In *Phillippi*, "[r]esponding to a journalist's FOIA request for records regarding the CIA's alleged efforts to convince media outlets not to make public what they had learned about the *Hughes Glomar Explorer*, the Agency refused to either confirm or deny whether it had such records.  Thus the term '*Glomar* response' entered the FOIA lexicon."  *Roth v. U.S. DOJ*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (citation omitted).

[4] On January 24, 2013, Ms. Taplin filed a second complaint against the Government, seeking a Court order compelling the production of documents responsive to her FOIA request regarding any investigation or background information regarding the activities of the New Orleans Police Department, 7th District, between 1994 and 1996.  That case is still pending before this Court, and the Government is making a series of rolling productions.  *See generally Taplin v. U.S. DOJ*, No. 1:13-cv-00102-RC (D.D.C.).

*generally* Defs.' Mot. Summ. J., ECF No. 17. Ms. Taplin has taken the position that the case was not ripe for dispositive briefing. *See* Joint Status Rep. 2, ECF No. 16.

### III. ANALYSIS

#### A. Legal Standard

When assessing a summary judgment motion in a FOIA case, the district court reviews the matter *de novo*. *See* 5 U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174, 179 (D.D.C. 2013). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). The reviewing court's determination may be based on the record and agency affidavits "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Generally, a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

"[D]isclosure, not secrecy, is dominant objective of [FOIA]." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). "Consistent with this purpose, agencies may withhold only those documents or portions thereof that fall under one of nine delineated statutory exemptions." *Elliott v. USDA*, 596 F.3d 842, 845 (D.C. Cir. 2010) (citing 5 U.S.C. § 552(b)). "[T]he

exemptions are 'explicitly exclusive.'" *U.S. DOJ v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)). And it is the agency's burden to show that withheld material falls within one of these exemptions. *See* 5 U.S.C. § 552(a)(4)(B); *Elliott*, 596 F.3d at 845.

Under Exemption 7(C),[5] an agency is exempt from producing "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . ." 5 U.S.C. § 552(b)(7). As a preliminary step in applying Exemption 7(C), the Court must identify the individual's personal privacy interest in avoiding disclosure of the information sought. *See U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989). Once the privacy interest is identified, the Court evaluates the public interest in disclosure and determines whether the interest is strong enough to warrant an invasion of the privacy interest at stake. *See id.* at 771; *Davis v. U.S. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).

---

[5] The FBI also invoked Exemption 6 in its denial of Ms. Taplin's FOIA request, but the OIP only invoked Exemption 7(C) on review. *See* Hardy Decl. Exs. B & E, ECF No. 17-3. Because Ms. Taplin appears to concede that this FOIA dispute involves law enforcement records, and because Exemption 7(C) imposes a lesser burden on an agency with respect to the privacy interests of third parties named in such records, *compare* 5 U.S.C. § 552(b)(6) (exempting "personnel and medical files and similar files the disclosure of which would constitute a *clearly* unwarranted invasion of personal privacy" (emphasis added)), *with id.* § 552(b)(7) (exempting records or information compiled for law enforcement purposes [that] could *reasonably be expected* to constitute an unwarranted invasion of personal privacy" (emphasis added)), this dispute has been narrowed to just the applicability of Exemption 7(C). *See* Pl.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. 6 n.3, ECF No. 18; *see also Roth*, 642 F.3d at 1173 ("If the information withheld here was 'compiled for law enforcement purposes,' thus implicating Exemption 7(C), then we would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C).").

### B. Balance of Interests

Before applying the Exemption 7(C) balancing test, it is important to define the scope of the dispute. Because the FBI rejected Ms. Taplin's FOIA request in a *Glomar* response—refusing to either confirm or deny the existence of responsive documents—the interests to be balanced at this stage are not the private and public interests in the documents themselves, but rather the interests in having the FBI acknowledge that it *possesses* responsive documents. *See Roth v. U.S. DOJ*, 642 F.3d 1161, 1182 (D.C. Cir. 2011). Similarly, should the Court order identification of responsive documents (or categories of responsive documents), the FBI would still have the opportunity to claim exemptions over individual documents pursuant to regular FOIA practice because the instant dispute is ripe only as to the FBI's *Glomar* response. *See id.* Having so framed the interests at stake, the Court proceeds to balance Mr. Frank's privacy interest against the public interest in disclosure.

#### 1. Third Party's Privacy Interest

As a general rule, the D.C. Circuit has recognized that "the targets of law-enforcement investigations . . . have a substantial interest in ensuring that their relationship to the investigations remains secret." *Id.* at 1174 (quoting *Schrecker v. U.S. DOJ*, 349 F.3d 657, 666 (D.C. Cir. 2003)) (internal quotation marks omitted). The interest is substantial because "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Branch v. FBI*, 658 F. Supp. 204, 209 (D.D.C. 1987); *accord Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990). However, "FOIA-exempt information may not be withheld if it was previously disclosed . . . ." *Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 722 F. Supp. 2d 66, 72 (D.D.C.

2010) (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)) (internal quotation marks omitted).

If the FBI did in fact investigate Mr. Frank in relation to the Kim Anh murders, then under the general rule he is presumed to have a substantial interest in ensuring that the FBI keeps the fact of his investigation a secret. However, Mr. Lacaze's defense at trial pointed to Adam Frank as the true accomplice, and a Richland Parish Sherriff's Office report indicates that Mr. Frank had been bragging about shooting a New Orleans police officer. *See* Pl.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. Ex. 2, ECF No. 18-2. And during the sentencing in Mr. Frank's armed robbery conviction, for which he is currently carrying out a 65-year sentence, the presiding judge stated openly on the record: "I am extremely, extremely, extremely concerned that if this man ever gets out on the street, he is going to do some serious harm to somebody, somewhere, somehow, someday, and that serious harm could include murder. . . . You are a danger to society, you are really a danger to society." Pl.'s Mem. P. & A. Opp'n Mot. Summ. J. Ex. 1 (Sent. Tr. 7, Feb. 22, 2005), ECF No. 18-1. These facts weaken the rationales supporting Mr. Frank's privacy interest in non-disclosure. In view of the police report documenting Mr. Frank's supposed admission that he killed a New Orleans police officer, and the sentencing judge's damning statements about the threat Mr. Frank poses to society, it is not clear that an FBI admission that it has records concerning Mr. Frank would "engender comment and speculation and carr[y] a stigmatizing connotation" far beyond that which already exists. *Branch*, 658 F. Supp. at 209. In fact, given that Mr. Frank is, apparently, such a dangerous individual, members of the public might be surprised if the FBI did *not* have documents about him.

Ms. Taplin's request seeks all records relating to Adam Frank, and not just those related to the Kim Anh murders. *See* Hardy Decl. Ex. A, ECF No. 17-3. An Ouachita Parish Sheriff's Department notice specified that Mr. Frank was wanted by the FBI in New Orleans, strongly suggesting that that field office had responsive records to the request. Although that non-federal agency cannot waive the FBI's right to assert its *Glomar* response, *see Marino v. DEA*, 685 F.3d 1076, 1082 (D.C. Cir. 2012), if it was publicly known that the New Orleans field office sought Mr. Frank, it follows that no added stigma would accrue in confirming that this FBI interest resulted in the creation of documents. While it is the law of this circuit that another agency's disclosure cannot altogether preclude the FBI from asserting a *Glomar* response, the rule does not speak to the much narrower issue of whether such a disclosure can diminish a third party's privacy interest for purposes of Exemption 7(C). The Court finds that Mr. Frank's privacy interest exists in a diminished capacity.

### 2. Public Interest

The Court's next step is to identify the public interest at stake and weigh it against Adam Frank's diminished privacy interest. *Roth*, 642 F.3d at 1174–75. In putting forth the public interest, a plaintiff must show (1) "that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake"; and (2) that "the information is likely to advance that interest." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

Although a prisoner in post-conviction proceedings has an "intense personal interest" in obtaining documents that are potentially exculpatory, such a "personal stake in the release of the requested information is 'irrelevant' to the balancing of public and third-party privacy interests required by Exemption 7(C)." *Roth*, 642 F.3d at 1177 (quoting *Mays v. DEA*, 234 F.3d 1324,

1327 (D.C. Cir. 2000)). "FOIA is not a substitute for discovery in criminal cases or in habeas proceedings." *Id.* However, the D.C. Circuit has recognized "the public's more general interest in knowing whether the FBI is withholding information that could corroborate [a prisoner]'s claim of innocence." *Id.* at 1176. Indeed, "[t]he fact that [a prisoner] has been sentenced to the ultimate punishment strengthens the public's interest in knowing whether the FBI's files contain information that could corroborate his claim of innocence." *Id.* The heightened public interest is evidenced in part by the high-profile exonerations of death-row inmates and the recent flurry of popular media coverage of the topic. *See id.* (collecting media coverage). Although the Government seeks to distinguish *Roth* based on the FBI's participation in the underlying prosecution in that case, the D.C. Circuit's opinion does not emphasize the agency's involvement and repeatedly characterizes the applicable public interest as "whether the FBI is withholding information that could corroborate a death-row inmate's claim of innocence." *Id.* at 1175; *accord, e.g., id.* at 1176 (noting "the public's more general interest in knowing whether the FBI is withholding information that could corroborate Bower's claim of innocence"); *id.* at 1178 (identifying Roth's second asserted public interest as "the public's interest in knowing whether the FBI is withholding information that could help exonerate a potentially innocent death-row inmate"); *id.* at 1180 ("[W]e turn to the far more interesting question of whether Roth may overcome the FBI's *Glomar* response based on the public's more general interest in knowing whether the FBI is withholding information that could corroborate Bower's claim of innocence."). In light of the public's general interest in the exoneration of individuals who have been sentenced to the "ultimate punishment," the public interest in Mr. Lacaze's potential innocence may outweigh Mr. Frank's diminished privacy interest in the non-disclosure of FBI documents that could link him to the Kim Anh murders.

11

However, this public interest could outweigh the third party's privacy interest only if the plaintiff can meet a certain evidentiary threshold. Because Ms. Taplin seeks records concerning Adam Frank, whom she alleges actually committed the Kim Anh murders, she "must show that a reasonable person could believe that the following might be true: (1) that [Mr. Frank was] the real killer[], and (2) that the FBI is withholding information that could corroborate that theory." *Id.*

Ms. Taplin has not satisfied this evidentiary threshold. To show that Adam Frank was Antoinette's true accomplice, Ms. Taplin alleges that (1) a police report says that witnesses had heard Mr. Frank bragging about killing a New Orleans Police officer; (2) Mr. Frank was later found in possession of the weapon believed to have been used to commit the Kim Anh murders; and (3) Antoinette had threatened Officer Williams's life for ejecting her brother from the restaurant. *See* Compl. ¶¶ 25, 27–28, ECF No. 1; Hardy Decl. Ex. A n.1, ECF No. 17-3. But the record does not contain any *evidence* of these three assertions, and Ms. Taplin's opposition brief repeatedly cites to the complaint and original FOIA request for support. Neither of those documents had evidence attached, and the Court is unable to find any elsewhere in the record.[6] To show that "a reasonable person could believe" that Mr. Frank was the killer, Ms. Taplin must point to evidence. But she provides only allegations. *Roth*, 642 F.3d at 1180.

If the Court were to accept as true Ms. Taplin's allegations regarding Mr. Frank, it would conclude that a reasonable person could believe that Mr. Frank was the real accomplice. But Ms. Taplin must also show that a reasonable person could believe that the FBI is withholding

---

[6] Although Ms. Taplin requested limited discovery as part of this proceeding, the Court notes that the requested discovery would not have led to the production of evidence relevant to Ms. Taplin's factual burden. Ms. Taplin "d[id] not seek discovery about the *content* of any documents." Joint Status Rep. 2, ECF No. 16. Rather, she sought information related to the Government's searches, if any, for responsive documents. *See id.* at 2–3.

evidence that corroborates her theory. *See id.* Ms. Taplin does not provide any evidence, or even allegations, that meet this burden. While the complaint points to documents suggesting that the FBI has *some* files on Adam Frank, *see* Compl. ¶¶ 26, 28, ECF No. 1, it does not show that the agency is likely to have any that link him to the Kim Anh murders. The complaint does not allege, for example, that the FBI investigated those murders, which would have made it likely that the agency's documents regarding Mr. Frank are relevant to Mr. Lacaze's case. In view of Mr. Frank's extensive criminal background, it would not be surprising that the FBI has files on him. However, Ms. Taplin has not presented cause for a reasonable person to believe that the documents would have anything to do with the Kim Anh murders rather than Mr. Frank's other crimes. The evidentiary threshold is not satisfied in this case.[7]

## IV. CONCLUSION

For the foregoing reasons, the Court will grant the Government's motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 10, 2013

*/s/ Rudolph Contreras*
RUDOLPH CONTRERAS
United States District Judge

---

[7] The Department of Justice must also be the department of *justice*. Mr. Lacaze is on death row. That is neither a routine nor trivial matter, and Ms. Taplin's allegations raise serious questions. Although FOIA may not require that the FBI review any responsive documents it may possess in order to determine whether it has information that could support Mr. Lacaze's claim of innocence, it may wish to do so nonetheless.

13